**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **JOAN OLIVER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 17-1019** |
| | § | |
| **STANDARD INSURANCE COMPANY,** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Joan Oliver ("Plaintiff" or "Oliver") files this Original Complaint against Standard

Insurance Company ("The Standard").

**A.    PARTIES**

1.      Plaintiff, Joan Oliver, is an individual who is a citizen of the State of Texas and a

resident of Bexar County, Texas.

2.      The Standard is an insurance company incorporated under the laws of the State of

Oregon and has its principal place of business in Oregon.  The Standard can be served with

summons by serving its Attorney for Service, C T Corporation System, by certified mail, return

receipt requested, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

**B.      JURISDICTION**

3.      The Court has jurisdiction over the lawsuit under 28 U.S.C. **§** 1332(a)(1) because

Plaintiff and Defendant are citizens of different U.S. states and the amount in controversy

exceeds $75,000 excluding interest and costs.

3

## C.     VENUE

4.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

## D.     CONDITIONS PRECEDENT

5.     All conditions precedent to recovery have been performed, waived, or have occurred.

## E.     FACTUAL BACKGROUND

6.      Oliver was employed as an elementary school teacher—a light duty occupation— by the Northside Independent School District ("NISD") in San Antonio, Texas for 24 years.

7.     While employed by NISD, Oliver enrolled in an employee benefit plan that provided group long-term disability benefits ("LTD Plan") to NISD employees.  The plan was insured through a group policy issued by The Standard. In order to induce Oliver to enroll in the LTD Plan, The Standard represented to her that the LTD Plan would provide her disability benefits if she met the definition of disability under the policy and would continue to provide her benefits as long as she continued to be disabled under the policy. In reliance upon The Standard's representations, Oliver enrolled in and began paying the monthly premium for the plan        as        a        deduction        from        her        paychecks        from        NISD.

8.     During NISD's annual enrollment period for insurance effective January 1, 2012, Oliver elected a LTD benefit amount of $2000 per month, but in the enrollment period effective January 1, 2014, she elected to increase her benefit to $3400 per month.

9.     The LTD Plan provided the following definition of "Disability" for the first 24-months of the payment of LTD benefits:

> During the Benefit Waiting Period and the Own Occupation Period you are required to be Disabled only from your Own Occupation.

> You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:
>
> 1. You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and
> 2. You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.

10.     After the payment of 24-months of LTD benefits, the LTD Plan changed the definition of Disability to apply to "Any Occupation," rather than a claimant's "Own Occupation:"

> You are disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation.
>
> Any Occupation means any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.

11.     The LTD Plan also subjected claimants with certain disabilities to limited pay periods.  The Plan limited the payment of LTD benefits to "24 months during your entire lifetime for a Disability caused by one of more of the following: 1. Mental Disorders; …"

12.     Under the Plan, "Mental Disorder means any mental, emotional, behavioral, psychological, personality, cognitive mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome, regardless of cause (including any biological or biochemical disorder or imbalance of the brain) or the presence of physical symptoms.  Mental Disorder includes, but is not limited to, bipolar affective disorder, organic brain syndrome, schizophrenia, psychotic illness, manic depressive illness, depression and depressive disorders, anxiety and anxiety disorders."

13.     Oliver ceased working for NISD in any capacity on or about November 12, 2014 as a result of symptoms she experienced from post-traumatic stress disorder ("PTSD"), bipolar I disorder, major depressive disorder, stage 3 chronic kidney disease, and hypertension.   As a result of her symptoms, she had extreme difficulty interacting with others, thinking, concentrating, speaking, sleeping and with short-term memory loss.

14.     Thereafter, Oliver applied for LTD benefits with Standard.   As part of her application, she submitted an Attending Physician Statement ("APS") and Mental Health Provider Report ("MHPR") both completed by Dr. Joseph Simpson, her psychiatrist.   In both forms, Dr. Simpson noted her primary diagnosis was bipolar disorder with secondary diagnoses of general anxiety disorder and stage 3 kidney disease, she was suffering from severe anxiety and depression, and he emphasized she had a marked to extreme impairment in her social functioning, ability to concentrate and ability to adapt to stress.   He stressed it was "unrealistic for her to return to her very stressful, emotionally challenging job."

15.     On November 19, 2014, Oliver entered a several week Intensive Outpatient Program at Methodist Specialty and Transplant Hospital to seek treatment for her increasingly severe symptoms.   Her first IOP ended on December 13, 2014, but due to a reemergence of severe symptoms, she was readmitted to the IOP program from December 24, 2014 to January 18, 2015, during which she was diagnosed for the first time with delayed onset PTSD due to a violent attack she experienced several years prior.

16.     In its investigation of Oliver's claim, Standard collected her medical records, asked her physicians to fill out additional MHPRs, and interviewed Oliver by telephone on numerous occasions.   Standard obtained medical records from Methodist Specialty and

Transplant Hospital, Dr. Simpson, Rick Wadsworth, her licensed professional counselor, Dr. Susan Diamond, her nephrologist, and Dr. Hormazd Sanjaya, her family practitioner.

17.     During early January 2015, Laura Nelson, a nurse employed by Standard, repeatedly reached out to Oliver by telephone to interview her regarding her condition.  Oliver repeatedly pleaded with Nelson not to call her to ask about her symptoms because it agitated her and increased her anxiety.  She begged Nelson to call her sister or her medical providers instead to discuss her symptoms, which Nelson never did.  Nelson noted after each of her increasingly harassing calls that Oliver was agitated, "highly reactive," labile, and "emotionally dysregulated," yet she continued to call her causing Oliver extreme emotional distress.

18.     On January 6, 2015, Dr. Simpson and Dr. Hugo Hernandez, the psychiatrist who treated Oliver during her IOPs, submitted MHPRs to Standard.  Dr. Simpson reported she had recently been given the primary diagnosis of severe PTSD with dissociative symptoms with delayed expression with secondary diagnoses of severe bipolar disorder and stage 3 kidney disease.  He stated that upon examination, Oliver had pressured speech, she appeared disheveled, she had a strong startle response, a defensive and guarded affect, a depressed and alexithymic mood, a stooped posture, poor insight, and impulsive judgment.  He opined she had an extreme impairment in social functioning, concentration, and adaptation to stress and a moderate impairment in performing her activities of daily living ("ADLs").   Dr. Hernandez expressed similar opinions in his MHPR.

19.     On January 8, 2015, Standard advised Oliver in writing that it had temporarily approved her LTD claim for payment of $2000 per month through January 31, 2015, but that it had commenced a pre-existing condition investigation to determine if she was eligible to receive the entire $3400 a month in benefits for which she enrolled in 2014.   The investigation focused

upon whether Oliver received treatment for bipolar disorder and/or PTSD in the 90-day period—October 3, 2013 through December 31, 2013—before she enrolled to receive $3400 a month in LTD benefits.

20.    Thereafter, Standard requested Dr. Simpson, as well as Mr. Wadsworth, completely new MHPRs for Oliver.  In his January 16, 2015 MHPR, Dr. Simpson stated her primary diagnosis was still severe, acute, delayed onset PTSD with a secondary diagnosis of stage 3 kidney disease, that she was still extremely impaired in her ability to function socially, concentrate and adapt to stress, and although she was receiving treatment, she could not return to work.  Mr. Wadsworth also emphasized Oliver could not return to work.

21.    Standard also asked Dr. Diamond to complete a Medical Questionnaire in which she listed Oliver's diagnoses as severe PTSD and bipolar disorder and chronic kidney disease.  Dr. Diamond stated: "Do not think she can return to work as a teacher.  Not sure she will ever be able to work given her **psychological & physical state**.  This is long term/permanent impairment." (emphasis added).

22.    Less than a week later, Standard surprisingly asked Dr. Simpson and Mr. Wadsworth to complete yet another set of MHPRs even though they had already done so less than two weeks before.  Both medical providers provided answers very similar to those they gave on the January 16, 2015 MHPRs.

23.    On February 24, 2015, Standard sent Oliver a letter explaining that it had determined the causes of her Disability were bipolar disorder, depression, and anxiety—all "Mental Disorders" as defined by the Plan—and therefore it intended to apply the 24-month lifetime limit for the payment of LTD benefits to her claim which meant her payments for disability caused by a mental disorder would end December 11, 2016.  Standard entirely ignored

Oliver's diagnosis of stage 3 kidney disease in its letter and Dr. Diamond's opinion her disability was both psychological and physical.  Despite its decision, the Standard promised it would review her claim on an ongoing basis to determine if she was Disabled by other conditions which were not subject to the 24-month limitation.  That promise was not fulfilled.

24.     On February 25, 2015, Standard notified Oliver her LTD benefits in the amount of $2000 a month had been extended, but that it was still continuing to investigate whether she had a pre-existing condition that precluded her from receiving her entire $3400 a month benefit.

25.     In March 2015, Oliver hired the undersigned counsel to represent her in connection with Standard's pre-existing condition investigation of her diagnosed mental disorders, particularly her primary diagnosis of PTSD.  Upon learning counsel was representing Oliver, Standard asked for a copy of the police report documenting the violent attack that triggered Oliver's PTSD.  Counsel provided the police report to Standard, but because the crime had been committed in 2010, Standard took the position that Oliver must have displayed symptoms of PTSD long before December 2014 and therefore it was a pre-existing condition.

26.     Through counsel, Oliver gathered evidence from Dr. Simpson and Robin Gross, a therapist from Oliver's IOP who specialized in PTSD, that Oliver's PTSD diagnosis was not a pre-existing condition, but was rather a late onset diagnosis—a normal occurrence for patients suffering from PTSD.  Counsel submitted letters from both Dr. Simpson and Ms. Gross to this effect to Standard on September 10, 2015.

27.     Dr. Simpson explained the sudden onset of her symptoms leading to her diagnosis of PTSD in first occurred in January 2015 and stressed she had not exhibited these symptoms prior to that time.  He also emphasized that PTSD is diagnosed when symptoms begin, not when

the triggering event occurred.  Moreover, he expressly noted in his letter that **Oliver's "kidney function remains an ongoing issue that threatens her physical health."**

28.     On November 4, 2015, Standard finally determined Oliver's PTSD was not a pre-existing condition and paid her the past-due benefits it owed her and began paying her entire $3400 monthly LTD benefit moving forward.

29.     Several months later, in an attempt to limit its liability to pay Oliver LTD benefits, Standard began another investigation of Oliver's claim to determine if she was disabled due to a condition other than a mental disorder or whether her benefits would terminate when the 24-month limitation for mental disorders came into effect.  As part of this investigation, it gathered Oliver's medical records from the San Antonio Kidney Disease Center.  These records showed the following:

- On January 21, 2015, Dr. Diamond completed a Statement of Attending Physician in Claim for Disability Retirement for Oliver. On the form, she stated: **"In the last year, her kidney function has progressively worsened.  The kidney function dropped from 46% to 33%** … Stress can affect kidney function and make it worse."

- On July 15, 2015, Dr. Diamond noted Oliver's noted **Oliver's kidney function had been stable until this year, but now her glomerular filtration rate ("GFR")—which measured her level of kidney function and her stage of kidney disease—had dropped from 40 to 22.  A GFR of 22 meant that Oliver's kidney disease had advanced from stage 3 to stage 4 (in stage 4, patients have a GFR of 29 to 15), which showed a severe loss of kidney function.**

- On August 14, 2015, Dr. Diamond noted Oliver had developed edema in her extremities and gum swelling due to taking Lotrel for hypertension and **her GFR remained at 22.**

- On February 2 and May 3, 2016, Dr. Diamond noted **Oliver's GFR was still very low at 23.**

- On May 17, 2016, **Dr. Mathias Kapturczak encouraged Oliver to get evaluated for a kidney transplant in view of her worsening kidney function.**

30.     Standard also obtained medical records from Dr. Ellen Lin, a pain management doctor, who treated Oliver for lumbar spondylosis and lumbar radiculopathy with lumbar transforminal epidural steroid injections.

31.     In July 2016, Oliver wrote Standard a letter explaining the symptoms she suffered as a result of her stage 4 chronic kidney disease.  These symptoms included difficulty engaging in conversation, an inability to concentrate, a loss of perceptual motor coordination, difficulty with decision-making, severe swelling of her feet and ankles, insomnia due to persistent nausea and excessive urination, frequent headaches, and chronic, severe fatigue.

32.     Standard also asked Dr. Simpson, Mr. Wadsworth, and Dr. Diamond to complete Medical Questionnaire's on behalf of Oliver.  In his July 28, 2016 questionnaire, Dr. Simpson stressed Oliver was permanently disabled and stated: "Even before the worsening of her kidney disease, I considered her permanently disabled.  She had reached a point where she was simply unable to tolerate the stress of work with her severe psychiatric illness in spite of extensive treatment. **Now the worsening of her kidney disease is having a significant impact on her concentration and emotional function, and may well progress to transplant or dialysis, each of which would further impair her functioning**."  After listing stage 4 kidney disease as one of Oliver's major diagnoses, Mr. Wadsworth stated on his July 6, 2016 questionnaire that "client's disability makes return to work impossible.  Prognosis for return to work extremely poor."

33.     Dr. Diamond stated on her July 21, 2016 questionnaire that **Oliver was not able to work because "[h]er kidney disease will worsen with time.  We are evaluating her for kidney transplant."**

9

34.     Despite the fact Standard was ostensibly investigating whether Oliver had a physical disease that caused her to be disabled, it repeatedly and consistently insisted in her claim file that she had no other disabling conditions other than her diagnosed mental disorders that were subject to the 24-month limit for the payment of LTD benefits.

35.     After receiving the records relating to her stage 4 kidney disease, on July 29, 2016, Standard referred Oliver's claim for a medical records review by an internal medicine physician and asked the physician to answer several questions, including whether Oliver had a medical diagnosis that was not considered a mental disorder and what her restrictions and limitations were stemming from that diagnosis.

36.     Dr. Charles Glassman, who performed the review and drafted an October 27, 2016 Physician Consultant Memo, only reviewed Oliver's medical records and did not speak to Oliver or to her physicians.   Although Dr. Glassman acknowledged the objective medical evidence supporting Oliver's diagnosis of stage 4 kidney disease, he dismissed the effect of the diagnosis by falsely stating "there [was] no medical documentation that the claimant has active symptoms associated with kidney disease."   In his summary of Oliver's medical records, he cherry-picked positive statements from the records, while deemphasizing or entirely ignoring statements in her records showing her kidney disease and her resulting symptoms were precipitously worsening.   While Dr. Glassman admitted it was "not unexpected that one with Stage 4 Chronic Kidney Disease would suffer fatigue or lack of endurance and possibly decreased muscle strength," he opined Oliver's restrictions and limitations would not prevent her from performing a sedentary job.

37.     Dr. Glassman attached his curriculum vitae to his report and it showed he had absolutely no experience with nephrology or treating patients with kidney disease.

38.     After obtaining Dr. Glassman's report, Standard referred Oliver's claim to a vocational specialist to conduct an "any occupation" review.  In the referral form, Standard merely copied Dr. Glassman's unsupported restrictions and limitations for Oliver and asked the specialist to find sedentary occupations she could perform within the wage requirement set forth in the LTD Plan.

39.     The vocational specialist unsurprisingly concluded there were three sedentary occupations Oliver could perform within her wage requirements and with her education, training, and work experience.

40.     On December 5, 2016, Standard advised Oliver her LTD benefits would end effective December 11, 2016 due to the 24-month limitation in the LTD Plan for disabilities caused by mental disorders and due to its specious conclusion her stage 4 kidney disease did not prevent her from performing "Any Occupation"—*i.e.,* a sedentary job.  Although Standard briefly summarized Oliver's medical records relating to her stage 4 kidney disease and cherry-picked statements from those records it believed supported its conclusion, in rendering its decision it relied solely on the opinion of Dr. Glassman who concluded Oliver's stage 4 kidney disease would not prevent her from performing a sedentary job and on the opinion of its vocational specialist who concluded there were three sedentary occupations Oliver could purportedly perform with her alleged restrictions and limitations.

41.     On July 17, 2017, Oliver appealed Standard's decision to terminate her LTD benefits.  With her appeal, Oliver submitted a functional capacity evaluation ("FCE") performed by Dr. Marcus Hayes, updated medical records from Dr. Larry Davis, her new nephrologist, the Renal Transplant Clinic at Methodist Specialty and Transplant Hospital, Dr. Sanjana, Dr. Lin, and Dr. Carmen Carlile, her chiropractor.

42.     Based on Dr. Hayes's examination of Oliver and the various tests he performed, he concluded she could only function on a sub-sedentary physical demand level—*i.e.,* she could perform "any occupation" as defined in the LTD Plan.  He based this conclusion on, among other things, her inability to lift more than 5 pounds on an occasional basis, her inability to use her hands on more than an occasional basis, and her inability to sit for longer than an infrequent basis—only 1-2% of the day.

43.     Oliver's records from Dr. Davis revealed consistently abnormal results on renal function panel lab results, including results from June 2, 2017, that revealed she had a GFR of 19 (20 is considered the threshold for a patient who requires a kidney transplant), high levels of urea nitrogen (BUN) and creatinine, and low levels of red blood cells, hemoglobin and hematocrit.  In fact, after obtaining these results, Dr. Davis instructed Ms. Oliver to contact the Renal Transplant Clinic at Methodist Specialty and Transplant Hospital immediately to be evaluated for a kidney transplant.  In addition, the records show Ms. Oliver consistently complained to Dr. Davis about chronic, disabling fatigue and edema stemming from her kidney disease.

44.     Oliver's records from the Renal Transplant Clinic showed she had a June 9, 2017 office visit with Dr. Adam Bingaman, who believed she needed and was a very good candidate for a kidney transplant.

45.     Ms. Oliver's records from Dr. Sanjana showed she complained of severe left shoulder pain with decreased range of motion, joint swelling, and myalgia.   He also diagnosed her with hypertension, rotator cuff syndrome, bursitis of her shoulder, chronic anemia, vitamin D deficiency, mixed hyperlipidemia, and carpal tunnel syndrome.

46.     Ms. Oliver's records from Dr. Lin showed she was referred by Dr. Sanjana for her shoulder pain.  Ms. Oliver told Dr. Lin she had sharp, achy shoulder pain that radiated down both

arms, and, as a result, she had difficulty lifting objects, moving her right arm, dressing, writing, typing, driving, and doing household chairs.   Dr. Lin gave Ms. Oliver a right shoulder subacromial bursa steroid injection.   She also reiterated Oliver had been diagnosed with lumbar radiculopathy, lumbar spondylosis, and low back pain.

47.   Ms. Oliver's records from Dr. Carlile showed she received very frequent treatments for pain in her shoulders, lower back, arms, feet, and ankles.   Her office visit notes for almost a year show she consistently complained of severe pain and an inability to sit for longer than an hour.

48.   After Oliver submitted her appeal, but before Standard rendered a decision, she supplemented her appeal with a letter authored by Dr. Davis.   In his letter, Dr. Davis stressed Oliver was suffering from stage 4 kidney disease which was evidenced by her most recent GFR of 19.   He reported the disease caused her to have many disabling physical symptoms, including overwhelming fatigue, chronic insomnia, restlessness, weakness, edema in her extremities, neuropathic pain in her feet, chronic anemia, daily severe headaches and frequent nausea.   He also emphasized she suffered from numerous cognitive deficits from the disease, including an inability to concentrate, short-term memory loss and difficulty making decisions—all common cognitive symptoms for patients with stage 4 kidney disease.   He also reported Oliver had passed all the criteria for receipt of a kidney transplant, and pending approval from her health insurer, she would be listed for a transplant with the United Network for Organ Sharing through the Renal Transplant Institute because she did not have an available living donor.   He also emphasized her condition was permanent and irreversible without a kidney transplant.   In conclusion, he opined Oliver could not perform a sedentary occupation due to her various physical and cognitive symptoms and, that if she was forced to return to work, her symptoms and

kidney function would only worsen.

49.     On August 23, 2017, Standard notified Oliver it had upheld its termination of her LTD benefits.  In its letter explaining the bases for its opinion, Standard again relied solely on a medical records review performed by another physician consultant and on an "any occupation" review performed by a vocational specialist.   Based on the physician consultant's report, Standard repeatedly insisted her stage 4 kidney disease was stable and that her disability was related more to her mental disorders which were subject to the 24-month limitation on the payment of benefits.   It also dismissed the results of Oliver's FCE because it alleged the FCE's findings were questionable and were contradicted by the clinical findings in her medical records. Unsurprisingly, the vocational specialist concluded Oliver could perform the three sedentary occupations it previously identified even if Oliver would be required to change positions and rest to alleviate her discomfort and fatigue.

50.     On September 5, 2017, Standard notified Oliver that it received Dr. Davis's letter, but had not considered it as part of her appeal.  It made this decision despite the fact it received the letter by fax before it rendered its decision on her appeal.

51.     After Standard closed Oliver's claim, she submitted a letter to Standard authored by Dr. Simpson, her psychiatrist.  Dr. Simpson stressed that Oliver's functional impairments stemming from her stage 4 kidney disease were severe and were distinct and "pale[d] in comparison" to her psychiatric illnesses.  He emphasized that her kidney disease had caused various disabling symptoms, including extreme fatigue, insomnia, restlessness, weakness, swelling of her legs and arms, pain in her feet, severe headaches and frequent nausea.

52.     Standard's overall handling and investigation of Oliver's claim for LTD benefits was riddled with bad faith.  First, it insisted upon engaging in a many months long frivolous pre-existing condition investigation to limit the amount of her monthly LTD benefits, and then it almost entirely ignored Oliver's medical documentation relating to her stage 4 kidney disease to conclude she was not entitled to further benefits after the 24-month limit for mental disorders expired.  In short, Standard's decision to terminate Oliver's benefits and its conclusion that it would uphold that decision on appeal was utterly unreasonable and was unsupported by the great weight of the medical evidence in her claim file and the information that was readily available to it.

53.      As a result of The Standard's unjustifiable conduct and its wrongful termination of her LTD benefits, Oliver has experienced severe financial distress and mental anguish.  She was also forced to hire the undersigned counsel to prosecute her claims against Standard.

## H.     CAUSES OF ACTION

### BREACH OF CONTRACT

54.     Oliver incorporates paragraphs 1-53 as if fully set forth herein.

55.     According to the LTD Plan, Standard has the duty to pay monthly LTD benefits as long as Oliver remains disabled under the Policy and submits proof of her disability. Oliver has met these requirements under the Policy.

56.     Standard's termination of Oliver's LTD benefits under the LTD Plan and under the laws of the State of Texas, constitutes a breach of Standard's contract with Oliver. As a result of this breach of contract, Oliver is entitled to recover the amount of her past-due LTD benefits and reinstatement of her monthly LTD benefits under the LTD Plan.

## VIOLATION OF THE PROMPT PAYMENT OF CLAIMS ACT

57.     Oliver incorporates paragraphs 1-56 as if fully set forth herein.

58.     Standard's acts, omissions, failures and conduct violate Section 542 of the Texas Insurance Code because it failed to pay Oliver's monthly LTD benefits within the applicable statutory period. In the event it is determined Standard owes Oliver any monies on her LTD claim, then Standard has automatically violated Section 542 in this case.

## VIOLATIONS OF THE DTPA

59.     Oliver incorporates paragraphs 1-58 as if fully set forth herein.

60.     Oliver is a consumer of goods and services provided by Standard pursuant to the DTPA. Oliver has met all conditions precedent to bringing this cause of action against Standard.

61.     Specifically, Standard's violations of the DTPA include, without limitation, the following matters: By its acts, omissions failures, and conduct, Standard has violated Sections 17.46(b)(5), (7), (9), (12), and (24) of the DTPA.

62.     Standard's violations include, without limitation, (1) its baseless, many months long pre-existing condition investigation it conducted in order to attempt to reduce its liability for Oliver's monthly LTD benefit; (2) its continual insistence Oliver's disability was caused solely by mental disorders despite the overwhelming evidence her symptoms from stage 4 kidney disease preventing her from working in any capacity; (3) its overwhelmingly heavy reliance upon unqualified and inexperienced physician consultants to terminate her benefits and uphold that decision on appeal; (4) its refusal to consider highly relevant and strong evidence of her disability stemming from her stage 4 kidney disease;  (5) its failure to give Oliver the benefit of the doubt, and (6) its failure to continue to pay Oliver's monthly LTD benefits for which liability had become reasonably clear.

63.     Oliver is entitled to recover under Section 17.46(b)(5) of the DTPA because Standard represented to Oliver that its insurance policy and its adjusting and investigative services had characteristics or benefits that it did not have.

64.     Oliver is entitled to recover under Section 17.46(b)(7) of the DTPA because Standard represented that its insurance policy and its adjusting and investigative services were of a particular standard, quality, or grade when they were of another.

65.     Oliver is entitled to recover under Section 17.46(b)(9) of the DTPA because Standard advertised its insurance policy and adjusting and investigative services with the intent not to sell them as advertised.

66.     Oliver is entitled to recover under Section 17.46(b)(12) of the DTPA because Standard represented to Oliver that its insurance policy and its adjusting and investigative services conferred or involved rights, remedies, or obligations that it did not have.

67.     Oliver is entitled to recover under Section 17.46(b)(24) of the DTPA because Standard failed to disclose information concerning goods or services which were known at the time of the transaction and such failure to disclose was intended to induce Oliver into a transaction which Oliver would not have entered had the information been disclosed.

68.     Oliver is entitled to recover under Section 17.46(b)(12) and (20) and 17.50(a)(2) of the DTPA because Standard has breached an express warranty that Oliver would continue to receive LTD benefits under the LTD Policy as long as she presented evidence she was "Disabled."

69.     Oliver is entitled to recover under Section 17.50(a)(3) of the DTPA because Standard's actions are unconscionable in that it took advantage of Oliver's lack of knowledge, ability and experience to a grossly unfair degree.

70.     Oliver is entitled to recover under Section 17.50(a)(4) of the DTPA because Standard's conduct, acts, omissions, and failures are unfair practices in the business of insurance.

71.     All of the above-described acts, omissions and failures of Standard are a producing cause of Oliver's damages as described in the petition. All of the above-described acts, omissions, and failures of Standard were done knowingly and intentionally as those terms are used in the Texas Deceptive Trade Practices Act.

**VIOLATIONS OF SECTION 541 OF THE TEXAS INSURANCE CODE**

72.     Oliver incorporates paragraphs 1-71 as if fully set forth herein.

73.     Oliver has satisfied all conditions precedent to bring this cause of action.

74.     By its acts, omissions, failures and conduct, Standard has engaged in unfair and deceptive acts or practices in the business of insurance in violation of section 541 of the Texas Insurance Code. Such violations include, without limitation all the conduct described in this complaint, plus Standard's unreasonable delays in the investigation of Oliver's claim and Standard's failure to pay monthly LTD benefits for which liability had become reasonably clear. They further include Standard's failure to give Oliver the benefit of the doubt. Specifically, as described in Oliver's factual allegations, Standard is guilty of the following unfair insurance practices:

   a.     Engaging in false, misleading and deceptive acts or practices in the business of insurance;

   b.     Engaging in unfair claims settlement practices;

   c.     Misrepresenting to Oliver pertinent facts or policy provisions relating to the coverages at issue;

      d.      Not attempting in good faith to effectuate a prompt, fair and equitable settlement of claims submitted for which liability became reasonably clear;

      e.      Refusing to pay claims without conducting reasonable investigations with respect to the claims; and

      f.      Failing to promptly provide Oliver with reasonable explanations of the basis in the insurance policies in relation to the facts or applicable law for the termination of Oliver's benefits.

75. Standard also breached the Texas Insurance Code when it breached its duty of good faith and fair dealing.

76. Oliver's damages resulted from Standard's conduct.

77. The Standard's acts, omissions, and failures were committed knowingly as that term is described in the Texas Insurance Code.

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

78. Oliver incorporates paragraphs 1-77 as if fully set forth herein.

79. By its acts, omissions, failure and conduct, Standard has breached its common-law duty of good faith and fair dealing by terminating Oliver's LTD benefits without any reasonable basis and by failing to conduct a reasonable investigation to determine whether there was a sufficient basis for the termination of her benefits.

80. Standard has also breached this duty by unreasonably delaying payment of Oliver's LTD benefits because Standard knew or should have known that it was reasonably clear that Oliver was "Disabled" under the LTD Plan. These acts, omissions, failures and conduct of Standard are a proximate cause of Oliver's damages.

## I.    WAIVER AND ESTOPPEL

81.    The Standard has waived and is estopped from asserting any coverage defenses, conditions, exclusions, or exceptions to coverage not contained in any of its denial letters to Oliver.

## J.    DAMAGES

82.    As a direct and proximate result of defendant's conduct, Oliver suffered the following injuries and damages:

a.    The amount of her monthly LTD benefits from December 12, 2016 to the present;

b.    An 18% per annum penalty on the amount of her past-due benefits;

c.    Mental anguish;

d.    Loss of credit reputation;

e.    Pre- and post-judgment interest;

f.    In the alternative to (g) and (h), an award of damages for mental anguish in an amount of up to three times economic damages for Standard's knowing violations of the DTPA or an award of up to three times the amount of damages for mental anguish and economic damages for Standard's intentional violations of the DTPA pursuant to Tex. Bus. & Com. Code § 17.50(b)(1);

g.    In the alternative to (f) and (h), an award of up to three times the amount of actual damages for Standard's knowing violations of the Texas Insurance Code pursuant to Tex. Ins. Code § 541.152(b);

h.    In the alternative to (f) and (g), exemplary damages in an amount to be determined by the finder of fact that is sufficient to punish Standard for its intentional and malicious breaches of its duty of good faith and fair dealing owed to Oliver pursuant to Chapter 41 of the Tex. Civ. Prac. & Rem. Code; and

i.    Reinstatement of her monthly benefits under the LTD Plan.

### K.   ATTORNEY'S FEES

83.   As a result of Standard's conduct, Oliver has been forced to retain the undersigned attorney to prosecute this action and has agreed to pay reasonable attorney's fees. Oliver is entitled to recover these attorney's fees under Chapter 38 of the Texas Civil Practices and Remedies Code, Sections 541 and 542 of the Texas Insurance Code, and Section 17.50 of the DTPA.

### L.   JURY DEMAND

84.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Oliver demands trial by jury in this action of all issues so triable.

### M.   PRAYER

Oliver prays that Standard be cited to appear and answer herein, and that upon trial hereof, that Oliver have and recover such sums as would reasonably and justly compensate her in accordance with the rules of law and procedure, both as to actual damages, consequential damages, statutory damages, equitable relief, mental anguish and/or treble damages under the Texas Insurance Code and Texas Deceptive Trade Practices Act, and all punitive, additional, exemplary damages as may be found. In addition, Oliver requests the award of attorney's fees for the trial and any appeal of this case, for all costs of court, for prejudgment and post judgment interest as allowed by law, and for any other and further relief, at law or in equity, to which she may show herself to be justly entitled.

Respectfully Submitted,

**THE LAW OFFICE OF JESSICA TAYLOR**
14100 San Pedro, Suite 602
San Antonio, Texas 78232
(210) 402-4022 (Telephone)
(210) 402-1225  (Fax)


By:   /s/ *Jessica Taylor*
        JESSICA TAYLOR
        Texas State Bar No. 24013546
        jessica@jtaylorlaw.com
        MANUEL ACUÑA-NEELY
        Texas State Bar No. 24091489
        manuel@jtaylorlaw.com